596 So.2d 365 (1992)
SUCCESSION OF Sadie RUSSO.
No. 91-CA-0669.
Court of Appeal of Louisiana, Fourth Circuit.
March 17, 1992.
Mark M. Dennis, Metairie, for appellant.
Anthony S. Taormina, Metairie, for appellee.
Before BYRNES, WARD and ARMSTRONG, JJ.
ARMSTRONG, Judge.
Plaintiff, Rosemary Snow, appeals from a judgment dismissing her petition to set aside a judgment of possession rendered in favor of defendant, Edwin P. Russo. Defendant has filed an answer seeking damages *366 and attorney's fees. We now affirm and remand.
On January 29, 1989, Sadie E. Russo died in New Orleans, Louisiana. On February 3, 1989, Edwin P. Russo, her nephew, probated an olographic will dated October 11, 1987, and was placed in possession of decedent's property by a judgment of possession. On March 8, 1989, plaintiff, a niece of the decedent, filed a petition to set aside the judgment of possession, along with a motion for a preliminary injunction and appointment of a notary to take inventory. A preliminary injunction was issued prohibiting the disposal of the estate of Sadie Russo, ordering that rents from her property be placed in the registry of the court, and ordering a $2,500.00 bond posted for damages. After denying Edwin Russo's motion for summary judgment, the trial court removed him as administrator, and appointed Snow as administratrix. On May 18, 1990, Edwin Russo filed a reconventional demand against Snow for damages and attorney's fees.
On November 14, 1990, following trial on the merits, the trial court rendered judgment in favor of Edwin Russo in the original action, dismissing Snow's petition to set aside the judgment of possession. The judgment was silent as to Edwin Russo's reconventional demand and, thus, it is presumed that the trial court rejected the reconventional demand. Sun Finance Co., Inc. v. Jackson, 525 So.2d 532 (La.1988); Palama v. Palama, 338 So.2d 776 (La.App. 4th Cir.1976). On November 26, 1990, Edwin Russo filed a timely motion for a new trial on the issue of damages and attorney's fees. On motion of counsel for Snow, hearing on the motion for new trial was continued from January 11, 1991 until February 8, 1991. There is no indication in the record that the trial court ever ruled on Edwin Russo's motion for new trial. On February 20, 1991, Edwin Russo filed an answer to Snow's appeal seeking damages and attorney's fees.
The broad issue before us in Rosemary Snow's appeal is whether Sadie Russo had the capacity to make the October 11, 1987 olographic will. Testamentary capacity is presumed and the burden of establishing the contrary is on the party attacking the will. Succession of Lyons, 452 So.2d 1161 (La.1984); Succession of Riggio, 405 So.2d 513 (La.1981). This presumption continues until overcome by clear and convincing evidence. Succession of Catanzano, 417 So.2d 863 (La.App. 4th Cir.1982). The narrow issue before this court is whether the trial court was clearly wrong in finding that Snow failed to meet her burden of proving by clear and convincing evidence that Sadie Russo lacked testamentary capacity.
Testamentary capacity is tested as of the time the will was made. La.C.C. art. 1472 (now repealed). At the time Sadie Russo made out the will in question, La.C.C. art. 1475 (now repealed) provided that the testator must have been "of sound mind."[1]See Succession of Riggio, supra; Succession of Catanzano, supra. The question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Moody, 227 La. 609, 80 So.2d 93 (1955).
On October 6, 1986, Sadie Russo, then 88 years old, fell and injured herself. At the time of her injury she lived in one half of a double home she owned on Navarre Avenue in New Orleans. Subsequently, she moved in with her niece, Rosemary Snow, and Snow's husband. She lived with Snow until her death on January 29, 1989. Sadie never married and had no *367 descendants. On October 29, 1986, shortly after Sadie moved in with her, Snow took Sadie to an attorney's office where she executed a statutory will leaving her whole estate to Snow.[2] Approximately one week later, on November 6, 1986, Snow took Sadie once again to the attorney's office where Sadie executed a power of attorney to Snow.
On Sunday, October 11, 1987, Snow arranged for Sadie to spend most of the day at the home of Edwin Russo, Sadie's nephew and Rosemary's first cousin, so that Snow could attend a fair in the country. Perry Russo, Edwin's brother, picked Sadie up that morning and drove her to Edwin's. While they were driving, Sadie complained to Perryas she had apparently done in the pastabout Snow's handling of her finances. At Edwin's, Sadie, Perry, Edwin and his wife, Barbara, talked and then ate lunch. After lunch Sadie requested a piece of paper and pen which were furnished by Barbara. In front of the three, Sadie then wrote:
 October 11, 1987
 I will all my money and property
 to Edwin P. Russo.
 Sadie E. Russo
It is this olographic will which is the focus of the suit filed by Rosemary Snow attacking Sadie's testamentary capacity. Snow called as a witness Sadie's treating physician since January 1984, Dr. Hanckes Klein, an internist. Dr. Klein treated Sadie on three occasions in 1984 for shingles. He said at that time he noticed no evidence of mental incapacity, although he noted that Sadie was forgetful. His records reflect that he treated her on September 18, 1985, prescribing some vitamins and a medication, Hydergine, to increase the blood supply to the brain. On September 27, 1985, Dr. Klein noted that Sadie had gained a pound. He continued her on the vitamins and Hydergine.
Dr. Klein next saw plaintiff on February 14, 1986. He noted that she had gained another pound and noted the presence of arthritis in her right hip and lumbar spine. Sadie was hospitalized on January 5, 1987 for pneumonia. Dr. Klein noted at that time the presence of generalized arteriosclerotic vascular diseasehardening of the arterieswhich he said was expected in a patient of Sadie's age. On March 3, 1987, he noted that Sadie appeared forgetful, had a cough, and complained of headaches.
On April 3, 1987 Sadie was hospitalized for eighteen days for treatment of strep pneumonia. Dr. Klein noted that she had congestive heart failure and generalized heart disease, and he noted for the first time what he characterized as "cerebral atrophy." Dr. Klein defined cerebral atrophy as the death of brain cells and shrinking of the brain, which he said was part of the normal aging process. He also noted that Sadie's hearing was impaired. He said that she did not communicate very well, i.e., that she was not responsive to some of his questions. He admitted that this may have been due to toxicity from a 105 degree fever. He later stated that similar unresponsiveness could have been due to Sadie's hearing impairment.
Dr. Klein saw Sadie on June 25, 1987. During that visit Snow presented a Social Security form which Dr. Klein signed indicating that plaintiff was unable to handle her finances. This allowed Snow to get Sadie's Social Security check made payable to either she or Sadie. Dr. Klein felt that Sadie was incapable of handling her finances, and he didn't feel that she would ever improve to the extent that she could do so again. At this June 1987 visit, Dr. Klein diagnosed cerebrovascular accidents or small strokes. He made no notes of plaintiff's mental state during a mid-September 1987 office visit. He next saw Sadie on March 3, 1988 when she was suffering from a low-grade fever and upper respiratory infection. She was hospitalized the next day. In August 1988 Sadie fell and bruised herself. In late December 1988 she fell again and fractured her pelvis. She was hospitalized until January 12, *368 1989. On January 29, 1989 she was admitted to the hospital with hardening of the arteries, edema of the leg, presumably the same fractured pelvis, and a stroke. She died that same day.
In general, Dr. Klein stated that Sadie's hospital records reflected that at times Sadie was alert in the morning and then confused in the afternoon. He could not state whether during any particular one-week period she would be more or less likely to be alert. He said that a person who can write her name and a sentence would be considered alert. He didn't believe that Sadie had been senile, and he never found any evidence of Alzheimer's disease.
Rosemary Snow testified that Sadie had had eye problems since the 1960's. She testified that as of 1985 Sadie was taking care of her business affairs. She said that Sadie had an unsuccessful implant operation in her right eye, and was blind in that eye. Snow said that Sadie couldn't see very well out of the other eye, and wore glasses and used a magnifying glass to read. She said that in October 1986 after Sadie came to live with her, but before Snow obtained power of attorney, she would show Sadie where to sign her name on checks. She said Sadie had a hearing aid and sometime would have trouble hearing.
Snow stated that after Sadie returned from the April 1987 hospital stay her speech became slower. She had to hire a sitter because of Sadie's physical infirmities. The sitter's name was Carrie Smith. She was hired in May 1987 and worked five days a week from 8:30 a.m. to 4:30 p.m. until the summer of 1988 when she had to leave because of illness. Snow testified that Perry Russo visited Sadie about once a week, Edwin about twice a month. Snow said that in October 1987 Sadie was not talking very much. Carrie would get her up in the morning, bathe her, and fix her breakfast. She said Carrie usually fed her. Sadie had no hobbies but would sometimes play simple card games. She also liked to sit outside or sit by the back door and look outside. Snow said Sadie didn't like to watch television, but the sitter said she and Sadie would sometimes watch television. Carrie would fix Sadie lunch; afterward, Sadie would take a nap. Sadie would have supper after Carrie left for the day.
On Sunday, October 11, 1987, Edwin returned Sadie to the Snow residence about 5:00 p.m. Snow said that Sadie seemed quieter than usual after she returned. Sadie did not mention the olographic will to Snow. Snow said that Sadie was capable of writing her name without assistance in October 1987, although she said Sadie could not see well enough to write without a magnifying glass. Snow testified that on at least one occasion she felt the need to use a ruler as a guide so that Sadie could sign her name on a check in a straight line.
Sadie's sitter, Carrie Smith, said she and Sadie took walks to the park, sat in the yard, and watched television. Smith recalled Sadie saying that she had left everything to Snow. She said she often had to coax Sadie to eat because she wouldn't eat by herself, although she did sometimes feed herself, and could do so if she wanted to. Smith said she never saw Sadie try to read without her magnifying glass, and said Sadie didn't really read anyway. Smith said that on the Monday after Sadie returned from spending the day at Edwin Russo's, she "wasn't very lucid at all." Smith said Sadie was in a crying mood, but when asked, said she had a good time at Edwin's. As the week progressed Sadie seemed to return to normal.
Perry, Edwin, and Edwin's wife Barbara all testified that when Sadie arrived that Sunday they sat in the living room and talked before eating lunch. All testified that Sadie talked with them, that her answers were responsive, her conversation was normal, and she never appeared to be disoriented or not know what was happening. All testified that Barbara cut up Sadie's food, one meatball and spaghetti, and that Sadie fed herself. Following lunch, Perry, Edwin and Sadie retired to the living room. Edwin said that the three were not discussing wills, but that at some point, Sadie asked for a piece of paper and a pen. Barbara gave these items to Sadie. She went to the kitchen table, and with all three *369 observing her, Sadie wrote the will. Edwin testified that Sadie had her glasses on. He did not remember whether she had her magnifying glass with her. Sadie hunched over the paper and slowly wrote. Perry, Edwin and Barbara all testified that no one said anything to Sadie as she wrote, and no one helped her write. Afterwards, she handed the will to Edwin. Neither Sadie nor any of the others talked about the will at the house. Perry testified that at some point that day, before she wrote the will, Sadie spoke of wanting to continue the Russo name. Edwin testified that on the way back to the Snow residence Sadie asked him not to say anything to Snow about the will.
Perry Russo lived in one half of a double home and rented the other half of the house. The son of Perry's tenant testified that he had gone with Perry to visit Sadie at the Snow home four times between August 1987 and December 31, 1987. He testified that Sadie never appeared disoriented and said that she never appeared not to know what was going on.
The record shows that Sadie was not happy with the way Snow was handling her finances. She apparently determined that she would rather leave her estate to her nephew Edwin. Although the medical evidence shows that Sadie Russo suffered from hardening of the arteries, was sometimes forgetful, and had suffered some small strokes, the record evidence as a whole furnishes a basis for a finding that Sadie understood the nature of the testamentary act and appreciated its effects. Thus, the trial court was not clearly wrong in finding that plaintiff failed to meet her burden of proving by clear and convincing evidence that at the time Sadie executed the olographic will she lacked testamentary capacity.
Edwin Russo seeks damages for the deprivation of the use of his inheritance for over two years during the pendency of Snow's suit; the setting aside of the injunction obtained by Snow; the defense of Snow's allegedly frivolous lawsuit; and for Snow's alleged wrongful and illegal distribution of over $110,000.00 of succession funds. He seeks attorney's fees for legal expenses incurred in connection with litigation relating to all of the above, including this appeal.
La.C.C.P. art. 3608 provides for the award of damages and attorney's fees for the wrongful issuance of a temporary restraining order or preliminary injunction. Such an award is within the discretion of the trial court. Khaled v. Khaled, 424 So.2d 370 (La.App. 2d Cir.1982); Ducote v. Couvillion, 401 So.2d 621 (La.App. 3rd Cir. 1981). In the instant case, Snow had in her possession a statutory will naming her as Sadie's sole heir. Even if the statutory will was defective as alleged by Edwin Russo, absent the olographic will she was attacking, Snow would have been a collateral heir entitled to a portion of Sadie's estate. Sadie's testamentary capacity was a disputed question of fact. Snow was protecting her interests by obtaining the restraining order prohibiting Edwin Russo from disposing of any part of Sadie's estate. Accordingly, we find no abuse of discretion in the trial court's refusal to award damages and attorney's fees based upon the wrongful issuance of the temporary restraining order. For the reasons stated above, we decline to award damages for frivolous appeal under La.C.C.P. art. 2164.
Edwin Russo also claims that he is entitled to damages under La.C.C. art. 2315. Liability under La.C.C. art. 2315 presupposes a duty owed to the damaged person by the person at fault. As previously discussed, Snow filed a legitimate suit putting Sadie Russo's testamentary capacity at issue. Snow owed no duty to Edwin Russo to refrain from filing such a suit.
Edwin Russo next argues that he is entitled to damages sustained as a result of Snow's illegal distribution of succession funds. During her testimony Snow mentioned $110,000.00 in certificates of deposit which were apparently part of Sadie Russo's estate. Edwin Russo apparently had no knowledge of the existence of these certificates at the time he filed the sworn descriptive list of all property in Sadie's possession at the time of her death. The sworn statement of assets and liabilities *370 filed by Edwin Russo listed a total net estate worth $55,072.00, consisting of only Sadie's Navarre Avenue home. Other than the reference in the statutory will to the distribution of "all certificates of deposit" Sadie died possessed of, the record contains no documentary evidence that these certificates existed. There is no evidence indicating that Rosemary Snow distributed any such certificates of deposit. This court cannot award damages in connection with the alleged illegal distribution of these certificates of deposit.
A judgment of possession terminates a succession proceeding. Succession of Dunford, 25 La.Ann. 56 (1873); Vordenbaumen v. Gray, 189 So. 342 (La.App. 2d Cir.1939). The effect of the trial court judgment dismissing Snow's petition to set aside the judgment of possession was the termination of the succession. However, apparently, a judgment of possession alone does not automatically discharge the succession representative, in this case Snow, who was named administratrix by the court, replacing Edwin Russo as administrator. Snow is still the lawful succession representative. Under La.C.C.P. art. 3332, Edwin Russo may file an application with the court asking that the court order Snow to file a final account of her administration of Sadie's estate. He may also have the court discharge Snow as succession representative and file a petition under La.C.C.P. art. 3393 to reopen the succession on the ground that other property of the succession has been discovered. We will remand this case to allow Russo to ask for a final accounting from Snow or to request that the court discharge her as succession representative.
For the foregoing reasons, we affirm the judgment of the trial court and remand this case for further proceedings.
AFFIRMED AND REMANDED.
NOTES
[1] La.C.C. art. 1477 now provides:

To have capacity to make a donation inter vivos or mortis causa, a person must be able to comprehend generally the nature and consequences of the disposition that he is making.
This new article "is intended to change the law." "It purposefully rejects the phrase `of sound mind' in order to avoid the jurisprudence regarding the usage of that phrase in former Civil Code Article 1475...." Revision Comments1991 to La.C.C. art. 1477. However, See Succession of Moody, 227 La. 609, 80 So.2d 93 (1955).
In the instant case, although we will apply the old Article 1475 and jurisprudence interpreting it, because the will was written in 1987, the distinction between the two differing requirements for capacity would not affect our decision.
[2] The statutory will directed that all certificates of deposit, money market certificates or monied instruments in her possession at the time of her death be "distributed to their rightful owners." Sadie Russo had apparently named beneficiaries or co-owners on these instruments.